**In re John J. STANTON, Respondent,**

**A Member of the Bar of the District of Columbia Court of Appeals.**

**No. M–124–82.**

District of Columbia Court of Appeals.

Argued Nov. 30, 1982.

Decided Nov. 30, 1983.

Before NEBEKER, FERREN and BELSON, Associate Judges.

## PER CURIAM:

This matter is before us for our consideration of the Report and Recommendation of the Board on Professional Responsibility (Board).

The Board has found one instance of respondent's "neglect of a legal matter entrusted to him" in violation of DR 6-101(A)(3) and two acts of respondent's "intentional failure to seek a client's lawful objectives" in violation of DR 7-101(A)(1).[1] The Board recommends suspension of respondent for sixty (60) days. We accept the Board's findings of fact as being supported by substantial evidence of record, and adopt the Board's recommended suspension of respondent for sixty (60) days.[2]

Accordingly, it is ordered by the court that respondent, John J. Stanton, be and he hereby is suspended for sixty (60) days from the practice of law for the reasons set forth in the appended Report and Recommendation of the Board. Respondent's sixty (60) day suspension is to be served concurrently with his suspension of a year and a day for similar disciplinary rule violations entered this day in *In re John J. Stanton,* 470 A.2d 272 (D.C.1983).

This order of suspension shall be effective thirty (30) days from the date of this opinion. D.C.Bar Rule XI § 19(3).

*So ordered.*

1. We note that at one point in discussing the recommended sanction, the Board's report to "three instances of willful refusal to pursue the client's lawful objectives" rather than the violations just identified. In our view this isolated misstatement does not vitiate the Board's recommendation.

2. We also agree with the Board that respondent's contentions concerning certain asserted

BOARD ON PROFESSIONAL RESPONSIBILITY

DISTRICT OF COLUMBIA COURT OF APPEALS

Bar Docket Nos. 180-79, 468-79, and 258-80

IN THE MATTER OF JOHN J. STANTON

Bar No. 168997

## REPORT AND RECOMMENDATION

Two separate reports concerning two separate petitions against the same respondent have been brought before this Board within a relatively short period of time. As has been our practice in other cases, we have consolidated the two cases in one Report and Recommendation to the Court of Appeals, and we recommend to the court a single sanction encompassing all of the conduct found to be in violation of the Code on Professional Responsibility.

### I. THE BENJAMIN CASE.

Docket Nos. 180-79 and 468-79 are before the Board on Professional Responsibility on the report of Hearing Committee No. 2. The Hearing Committee was confronted by a petition that concerned three separate charges arising out of respondent's conduct of the defense of Peggy M. Benjamin against criminal charges. For convenience, the three matters can be identified as the "bond review" matter, the "government plea offer" dispute, and the issue concerning the quality of respondent's communications with his client.

On the *bond review* matter, the Hearing Committee concluded that respondent had "intentionally fail[ed] to seek the lawful objectives of his client through reasonably available means permitted by law" in violation of DR 7-101(A)(1).[1] In connection

improprieties in the conduct of his disciplinary proceedings are similarly without merit.

1. The Committee did not pass upon an additional allegation based upon the same set of facts that respondent was also guilty of neglect in violation of DR 6-101(A)(3). The Board agrees with the Committee's disposition of the neglect charge.

with the violation found on the bond review matter, the Committee recommended an informal admonition as the appropriate sanction.

In connection with the government plea offer matter, the Hearing Committee concluded that Bar Counsel had failed to make out a violation of DR 7–101(A)(1) (intentional failure to pursue the client's lawful objectives) in connection with respondent's failure to assist his client in entering her plea of guilty. The Committee recommended that the charges based on the government plea bargain matter be dismissed.

Finally, the Hearing Committee recommended that we find that Bar Counsel had failed to make out a case of neglect on his charge that respondent had failed to communicate adequately with his client and had failed adequately to advise her. Finding no violation, the Hearing Committee recommended dismissal.[2]

This Board agrees with the Committee's finding that a violation was made out in connection with the bond review matter but disagrees with the Committee's conclusion that no violation was proved in connection with the government plea offer matter.

### A. *Ms. Benjamin's Criminal Cases.*

Ms. Benjamin had a number of criminal cases pending against her at roughly the same time. The procedural history of the relevant cases are summarized in detail in the report and recommendation of the Hearing Committee, and we do repeat that history here. By way of brief summary, Ms. Benjamin had two criminal cases pending against her in the Superior Court at the same time. The first, which the Hearing Committee labeled the "underwear case," was based on a charge of attempted larceny of assorted underclothing from Hecht's department store. Respondent was appointed to represent Ms. Benjamin in the underwear case.

The second case, which the Hearing Committee labeled the "crabmeat case," was also a charge of attempted larceny. Ms. Benjamin was represented by other counsel, particularly Mr. Bright, in the crabmeat case.

It was uncontested in the record before the Hearing Committee that at the time of Ms. Benjamin's arraignment on the underwear case, her bond was set at $1,000 with a 10% payment. Not having the requisite $100 to secure her release, Ms. Benjamin was incarcerated. It is also uncontested that Ms. Benjamin sent respondent a letter requesting him to file a bond review motion for her. Her request was unequivocal.

Respondent did not answer Ms. Benjamin's written request. A few days later Ms. Benjamin telephoned respondent from the District of Columbia Jail and renewed her request to him to file a bond review motion.

Respondent admits that after the letter and the telephone conversation outlined above, he did not prepare or file a bond review motion or make any other effort to obtain Ms. Benjamin's release from the District of Columbia Jail by helping her to secure the necessary $100. Consequent to respondent's inactivity, Ms. Benjamin remained in the District of Columbia Jail for seventeen days until her son, who had been out of town, returned to Washington and posted the requisite $100.

After Ms. Benjamin's release, respondent received a plea offer from the United States Attorney. Her two sets of lawyers disagreed about the advisability of her accepting the government's plea offer. The lawyers representing Ms. Benjamin on the crabmeat case concluded that acceptance of the government's plea offer was in the best interests of Ms. Benjamin. Respondent, on the other hand, concluded that the plea offer was not in Ms. Benjamin's best interests and he so recommended to her.

Respondent concedes that he had an adequate opportunity to urge his views upon

2. Bar Counsel has not opposed the Committee's proposed dismissal of either the government plea offer charges or the failure to communicate charges.

Ms. Benjamin and that she was competent to make the decision whether to plead guilty. After consideration of the competing advice of her two sets of lawyers, Ms. Benjamin concluded that she wished to accept the government's plea offer. Accordingly, Ms. Benjamin's other lawyers arranged for a hearing before Judge Neilson on October 15, 1979, at which time Ms. Benjamin was to plead guilty in both the underwear and crabmeat cases and to be sentenced.

At the hearing, respondent volunteered to the Court that he had advised Ms. Benjamin that the plea arrangement was "improvident and unwise" and respondent asked Judge Neilson to take this fact into account in the Rule 11 proceeding that he was then conducting on Ms. Benjamin's attempts to plead guilty. Ms. Benjamin's plea was accepted over respondent's objection, and she was sentenced.

As noted above, Bar Counsel brought a petition alleging three areas of misconduct: (1) in connection with the respondent's failure or refusal to file a bond review motion, Bar Counsel charged him with neglect and with intentionally failing to seek the lawful objectives of his client; (2) in connection with respondent's failure or refusal to assist Ms. Benjamin in accepting the government's plea bargain, Bar Counsel charged violations of the same two Disciplinary Rules; and (3) Bar Counsel charged respondent with failure to conduct meaningful communication and to provide assistance to his client amounting to a violation of the Disciplinary Rule prohibiting neglect.

B. *The Hearing Committee's Conduct of the Proceedings Below.*

Respondent has briefed and argued several points concerning the conduct of the proceedings below. His arguments are not well taken.

1. *Respondent's Charge That Bar Counsel Misled the Contact Member.*

First, respondent brings a welter of charges the net effect of which is that Bar Counsel hoodwinked a contact member into approving an informal admonition by presenting false and incomplete evidence to the contact member. Respondent's argument is put to rest by the Hearing Committee's finding of a disciplinary violation and by the disposition that we make of this case. Whatever evidence Bar Counsel presented to the contact member, there was more than probable cause, there was in fact clear and convincing evidence that respondent had violated one or more provisions of the Disciplinary Code. The requirement that a contact member review and approve petitions and informal admonitions is meant to act as an additional protection for respondents so that they are not faced with wholly unsubstantiated charges. Our review of the record convinces us there was more than adequate probable cause to go forward on this case.

There is no review of the probable cause determination provided for in our system any more than there is a review of the probable cause determination readily available to a defendant in a criminal case where the full panoply of due process rights applies. If this Board is to perform its functions of fairly and speedily determining when violations of the Disciplinary Code have occurred and of protecting the public from those who violate the Code, our proceedings cannot be allowed to descend into a hodgepodge of interlocutory reviews. The essence of fairness in our proceedings is that the matter is brought as promptly as possible before a hearing committee which hears the matter in a fair and even-handed way.

2. *Respondent's Motion to Dismiss the Petition As Defective on Its Face.*

Turning next to respondent's argument that the petition should have been dismissed on its face, we also cannot agree with its contentions. Our rules do not provide, nor do we think they must, for cases to be decided on motions made before the hearing.

As we said in *In the Matter of Erias Hyman,* Bar Docket No. 69–79, a hearing committee has no authority to dismiss charges. A hearing committee is to recommend to this Board what disposition should be made of any motions brought by respondent. If the motion requires the taking of evidence, the hearing of that evidence should be consolidated with the hearing on the merits. Recommendations both as to the ultimate disposition on the merits and as to any motions are then made by the hearing committee upon the basis of a fully developed factual record.

Once again, the same values are at stake. If this Board's procedures are not to suffer more complication and delay than now attends them, we must be careful not to allow procedural issues and motions practice to distract the Board's attention from the central questions: was there a violation and, if so, what sanction is appropriate. While the fundamental aspects of procedural fairness must be, and we believe are, observed, we must also bear in mind that these are not criminal cases and that the several layers of procedural due process protections that exist in criminal cases are inappropriate in the disciplinary system.

Respondent argues strongly that no lawyer should be put to the trouble and inconvenience of a hearing on a petition that is faulty on its face. Respondent's case does not test his argument since no fault appears on the face of the petition that respondent has attacked in this case. However, we feel bound to say that the inconvenience of a hearing before one of our committees is not a reasonable price to pay for the privilege of holding a license to practice law. This is particularly true in light of the fact that charges are brought only after a contact member of a hearing committee concurs with Bar Counsel's probable cause finding.

Once a basis of that sort has been laid, then the underlying purposes of the Board require that we proceed directly to a hearing on the merits rather than being detoured into questions of pleading and form. While the Board would have no hesitation in recommending dismissal of a case in which the respondent was not fairly notified of the charges against him because the petition was so inadequate as not to allow him to know with what he was charged, that determination is made at the Board level so that any possible objection to the petition can be considered together with the factual record in the case.

### 3. Respondent's Challenge to the Hearing Committee Chair's Power to Conduct Pre-Hearing Proceedings.

Last, we address respondent's argument that the hearing committee chairman acted beyond his authority when he conducted two pretrial conferences and disposed of certain matters in an attempt to simplify and expedite the hearing before the Committee. Respondent recognizes that our rules do indeed authorize a committee chair to act in this regard. Chapter 8, Section 3, Subsection (j) of the Board's Rules. However, respondent claims that a contradictory rule of the Court of Appeals requires that a hearing committee can act only by all three of its members. Rule XI, Section 5(b), District of Columbia Court of Appeals. However, we believe that the rule respondent cites refers only to the final reports and recommendations that hearing committees make to this Board.[3] Therefore, we do not feel there is any contradiction between that rule and the Board's rule that allows a hearing committee chair, acting alone, to dispose of certain procedural matters before the hearing begins.

We wish to take this opportunity to encourage the chairs of the various hearing committees to utilize the pre-trial procedures provided in our rules. We also point

---

**3.** The *reductio ad absurdum* of respondent's argument is that the hearing committee chairman, acting alone, could not grant continuances of hearing dates (Chapter 8, Section 1 of the Board's Rules), consider motions for additional discovery (Chapter 3A, Section 3 of the Board's Rules), or make recommendations concerning deferral of cases assigned to a hearing committee (Chapter 4 of the Board's Rules). We do not think respondent's view can be sustained.

out that, contrary to respondent's arguments, the hearing committee chair is under no obligation to consult with other members of the committee in making such pre-hearing determinations. The chair in this case chose to consult with the other attorney member of the committee before making his rulings. He was certainly within the spirit and letter of our rules when he chose to consult with his fellow committee member. However, we wish to make it absolutely clear, that he was under no obligation to do so and was free to act alone.

Of course, a hypothetical respondent who felt that a pre-hearing ruling of a chairman had deprived him of valuable rights would be free to raise the issue again before the hearing committee. In that event, we trust that the hearing committee would make a recommendation to this Board as to how the matter should be disposed of. Full review occurs at the Board level.

Once again, it is important not to allow our procedures to become bogged down in multiple determinations and redeterminations of issues that are properly committed to the chair of the hearing committee. The twin goals of our proceedings always must be swiftness and fairness.

C. *Respondent's Refusal to File a Bond Review Motion.*

We agree with the Hearing Committee's conclusion that respondent violated DR 7–101(A)(1) when he refused to file a bond review motion on behalf of his client in the face of her direct instruction to do so. A lawyer who refuses to file a motion as fundamentally important as a bond review motion after being instructed to do so by his client is in violation of the disciplinary rules except in certain unusual circumstances.

The factors involved in a judge's decision to reduce the severity of a criminal defendant's conditions of release are so subjective that no lawyer can be sure that such a motion would be frivolous except in certain clearcut cases. To be sure, if the client is subject to a five-day hold, is also arrested on an escape warrant from another sentence, has been revoked on his probation or parole, or otherwise has no possible chance of being released, then an attorney might be justified in refusing to file a bond review motion despite his client's request. Such a motion might be frivolous, and the lawyer would have an obligation not to burden the court with a pointless motion.

On the other hand, where the client can theoretically be released, then a bond review motion should always be filed when requested by the client.[4] It is simply impossible to predict with absolute certainty how a court will react to such a motion. Sometimes even the mere passage of time will convince a judge to reduce the severity of the conditions of release. Thus, the motion should always be filed when the client insists upon exercising his absolute statutory right to such a motion unless the lawyer determines that the motion would be wholly frivolous. D.C.Code § 23–1321(d).

This is not to say that a lawyer could not advise his client that such a motion was so unlikely to succeed as not to be worthwhile. A lawyer would certainly be justified in urging his opinion on the client and in telling his client that the lawyer's time and efforts would be better spent on other aspects of the case. However, if the client, having heard his lawyer's opinion and having understood it, rejects it and insists upon a bond review motion being filed, the lawyer is obligated to pursue his client's lawful objectives through reasonably available means permitted by law.

There is no question that a bond review motion is a reasonably available means permitted by law. The respondent in this case flatly refused to file such a motion despite repeated requests by his client. It was his judgment that such a motion would be worthless and that the client would be better off in jail. Our point is that an attor-

4. That Ms. Benjamin might theoretically have been released is demonstrated by the fact that after she secured her release without respon-dent's aid, she was again arrested. On this later arrest, her lawyer managed to secure her release.

ney is not entitled to substitute his own judgment for that of the client in a matter as fundamental as whether or not to ask that the client be released pending trial. The case belongs to the client, not to the lawyer. The lawyer is bound to exercise his professional judgment in advising the client. But if the lawyer's advice on such a fundamental matter is rejected, the lawyer has only two choices: either pursue the lawful objective of the client or withdraw.

What the lawyer may not do is simply substitute his own judgment for that of the client and leave an incarcerated indigent client isolated in the District of Columbia Jail with no one to turn to, his lawyer having simply overruled him.

When a lawyer represents an indigent criminal client, particularly one who is incarcerated, his duty is particularly compelling. For an indigent locked up in the District of Columbia Jail, the world is a hostile place indeed. Communications with one's family and friends and neighbors may be difficult or virtually impossible. The incarcerated indigent typically has few or no resources with which to deal with the many problems that confront him. The one person in the complex criminal justice system who is supposed to be unreservedly devoted to the interests of such a client is the appointed lawyer. When that lawyer ignores the views of the client, the client is left completely without assistance in a world that is then unrelievedly hostile.

### D. Respondent's Attempt to Thwart His Client's Plea of Guilty.

We part company with the Hearing Committee on the issue of respondent's handling of his client's attempt to plead guilty. In this case, complainant received contradictory advise from two different lawyers. One lawyer, Mr. Bright, urged complainant to accept a package plea of guilty in several cases, one of which was the case in which respondent was representing complainant. Respondent vigorously disagreed and urged his client not to accept the plea bargain.

We believe that the Hearing Committee misconstrued its role in resolving the ques-

tion whether respondent intentionally failed to pursue his client's lawful objectives in this matter. Our misgivings are based upon our view that the merits of respondent's opinion concerning the wisdom of the plea bargain are absolutely irrelevant to our determination of this case. Whether respondent was right or wrong in his views of the plea bargain has no place in our deliberations nor in our decision.

We are therefore troubled by the discussion at pages 23 and 24 of the merits of the Hearing Committee's report concerning respondent's views of the plea offer as against those of Mr. Bright. We are particularly troubled by the following excerpt from page 25 of the Hearing Committee's thoughtful and carefully conceived report: "Even if one assumes that Respondent's judgment on that point was erroneous, it was not so far fetched as to justify a finding of 'neglect' or of 'intentionally' failing to pursue a client's objectives." Frankly, we can hardly conceive of a good faith opinion of a lawyer concerning a legal matter which would be "so far fetched as to justify a finding of 'neglect' or of 'intentionally' failing to pursue a client's objectives."

A lawyer is duty-bound to exercise his best professional judgment on behalf of his client. Only where total inattention or incompetence is made out on the part of the lawyer in reaching the decision should we ever be in the business of assessing the correctness of the lawyer's advice to his client. Otherwise, we put ourselves in the position of a sort of court of appeals from lawyers' judgments. Any attempt on our part to do so would be the worst sort of second-guessing or Monday morning quarterbacking.

Therefore, we conclude that the Hearing Committee was incorrect when it discussed the rightness or wrongness of respondent's views about the plea and purported to base its decision, at least in part, upon its view of the reasonableness of respondent's views.

What is to us much more troubling concerning respondent's conduct in this matter

is the fact that, after a full opportunity to urge his views upon a competent client who disagreed with those views, respondent persisted in pressing his views in open court in an attempt to thwart his client's rationally arrived at decision to accept the plea bargain.

The facts show that respondent had had a full opportunity to argue to the complainant that she should not accept the plea bargain. In fact, respondent conceded at oral argument before the Board that he had had such an opportunity. Respondent further stated in argument before the Board that he had no doubt that the complainant was competent to make the decision that she made.

Once a lawyer's client, after full consultation, has reached a decision that the client is competent to make, then it seems to us that the lawyer is bound by that decision unless the client's decision is to seek an unlawful objective. In this case, there is absolutely no question that the client's objective—to plead guilty—was a lawful one. At that point, we believe respondent had an obligation to do his best to effectuate his client's desires. At an absolute minimum, he should have remained mute in court while the other lawyers conducted the plea procedure.

However, in this case respondent chose to take a more active role and to urge on the court his own personal views, which were in contradiction to the considered conclusion of his client. At page 4 of the transcript of the plea bargain, respondent interjected himself into the proceedings when no one had addressed him to say the following:

MR. STANTON: Would your honor note that in [case number] 8520, I would—I would endorse the waiver of trial under protest. I advised the defendant but—that I think this plea arrangement is improvident and unwise, and I have so advised her. I ask your honor to consider that fact.

Bar Counsel Exhibit 23 at page 4.

The court correctly and accurately perceived the anomaly of what respondent was doing. The court responded as follows:

THE COURT: Well, in what way can I consider it? She said she wished to plead guilty. I mean, the court hasn't a right to prevent a person from pleading guilty. She said she knows and understands fully what she is doing and wants to plead guilty. And, her attorney indicates the same.

MR. STANTON: I just want the Court to be fully informed of all the facts in case 8520.

THE COURT: Well, she is willing. There is nothing I can do, so long as she does it willingly and voluntarily...

*Id.*

Respondent's conduct, which is made out by the most clear and convincing evidence possible—his own words transcribed in open court—seems to us to be a serious violation of the Disciplinary Rules. No possible purpose of his client's was served by respondent's spreading his own personal views of the matter on the record after the client had decided to reject his advice. It is not a lawyer's place to seek to vindicate his own views, as opposed to those of his client, before a judge.

Respondent's conduct was particularly serious in the context of the importance of the transaction to Mr. Stanton's client. She was entering a plea of guilty in a series of cases. That plea would determine the status of her personal liberty for many months into the future. She earnestly believed, after full consultation with all of her lawyers, that the steps she was taking were in her best interest and would minimize the amount of time that she would ultimately have to spend in jail. Despite the clear fact, conceded by respondent, that his client was rational and fully informed, he interjected himself into the court procedure in an attempt to thwart the client's achieving her lawful objective of pleading guilty. This conduct violates the Disciplinary Rules.

Only the wisdom and vigilance of the presiding judge prevented respondent's in-

temperate behavior from frustrating his client's will. The fact that respondent did not succeed in frustrating his client's attempted plea does not weigh heavily in his favor.

On two separate occasions in the instant case, respondent simply overruled his client's stated views on the grounds that he knew better than the client did. He did not have the right to do so. If his client had been wealthy, had been on release in the community, or had been better educated, she might simply have retained the services of another lawyer who would do her bidding. However, the appointed lawyer whose client is in jail has an almost entirely captive audience in his client. The client has neither the resources nor the ability quickly and easily to change lawyers, particularly in connection with a matter like bond review which must be acted upon speedily.

For all these reasons, it seems to us that an appointed lawyer with an incarcerated indigent client has a particularly high duty of fidelity to that client's considered judgments.[5] When he breaches that duty in the high-handed manner that respondent breached his duty in this case, then his conduct rises to a considerable degree of severity.

In short, we believe that respondent violated the disciplinary rules when he intentionally failed to pursue his client's lawful objective and interjected his personal views in a forum where they had no place.

### E.  *The Quality of Respondent's Communications With His Client.*

We pause to note that we agree with the Hearing Committee's conclusion that, where respondent had communicated with his client, it is not our business to assess the quality of those communications. A neglect charge might be made out in a situation where no communications had occurred or where those communications were inappropriately brief or truncated in view of the complexity of the matters at hand. Neither situation appears on this record. Therefore, there could be no clear and convincing evidence of neglect based upon the quality of what a lawyer told his client unless the lawyer's competence were called into question.

### II.  *THE WILSON CASE.*

In Docket No. 258–80, respondent was charged with a violation of DR 6–101(A)(3) in that he neglected a legal matter entrusted to him. Bar Counsel charged that respondent had failed to obtain discovery, had failed to keep his client informed of the progress of the case, and had failed to investigate the case. The Hearing Committee found that there was no clear and convincing evidence that respondent failed to obtain discovery or that he failed to keep his client informed. It did find, however, that "there is clear evidence that Respondent neglected his client's legal matter. Despite the client's repeated assertions of innocence, Respondent concluded that his client was guilty, and failed to investigate the case, as charged."

The record fully supports this finding by the Hearing Committee. The facts on which it is based are fully set forth in the Committee's report, and indeed are for the most part undisputed. They can be briefly summarized.

### A.  *Mr. Wilson's Criminal Case.*

Respondent's client, Mitchell Wilson, and another man were arrested on June 8, 1980, and charged with assault with intent to commit robbery. Respondent was originally assigned to represent Wilson, but, when Wilson was found to be ineligible for legal assistance under the Criminal Justice Act,

---

**5.** This duty of fidelity to the client's judgment does not, in our view, extend to trial tactics and other exclusively legal or technical matters which are committed to the discretion of the lawyer acting on his client's behalf. In this case, the two matters on which respondent overruled his client were fundamentally important decisions on which the client's views must prevail.

respondent was retained for the flat fee of $1,000—$200 to be paid immediately, and $800 to be paid at the rate of $100 per month if Wilson was indicted. Wilson told respondent that he had been identified as having assaulted the complaining witness in an alley at about 3:45 a.m. He admitted being in the area, but denied knowing anything about the incident.

At a preliminary hearing held on June 19, 1980, respondent learned that the complaining witness had told the arresting officer that he had torn the shirt of his assailant, and that, when arrested, Wilson was found to have a torn shirt stuffed in his pocket (Tr. 110). Wilson told respondent that his shirt had been torn earlier when he had played basketball with a friend, David Williams. Wilson gave respondent Williams' address, but not his telephone number. Because of that fact, respondent concluded that Wilson had no real interest in calling Williams, and that Williams was not a genuine witness. Respondent therefore made no attempt to contact Williams (Tr. 111).[6]

The government offered to accept, before indictment, a plea of guilty to attempted robbery with the government not opposing Federal Youth Act Probation. Mitchell refused to plead guilty, asserting his innocence (Tr. 73). On July 8, respondent sent a letter to Judge Ugast stating that, if his client could be assured of a sentence under the Youth Act, he would recommend that the client plead guilty. That letter was not answered. Respondent at that time had made no investigation of the case beyond talking with his client and hearing the testimony of the officers at the preliminary hearing (Tr. 126).

Wilson and his co-defendant were indicted and were arraigned on October 14, 1980. On November 13, respondent testified, he had a half-hour telephone conversation with the Assistant United States Attorney in charge of the case (Tr. 109). On November 17, after a status hearing, respondent had a conference with his client, the co-defendant, and the co-defendant's attorney. Respondent testified that, by that time, he had concluded that his client had been involved in the incident. He so informed his client. His advice was that the defendants not take the stand, but that he would try to "knock down" the governments' case (Tr. 113–114). Respondent testified that he intended to interview the complaining witness, but had not done so by January 16, 1981, although the trial date was set for January 19, 1981 (Tr. 115).

On January 16, 1981, respondent learned that Wilson had hired another attorney. He called Wilson and berated him, using offensive language (Tr. 115–116). On January 19, 1981, the date originally set for trial, the case was postponed. Respondent sought out Wilson's mother and berated her for Wilson's change of attorneys. The mother felt so harassed by respondent's conduct that she complained to Bar Counsel, instituting the investigation which eventually led to the instant charges (Tr. 16–18).

Wilson and his co-defendant were acquitted at the trial which was held in March, 1981.

### B. Respondent's Failure to Investigate His Client's Case.

Respondent objects to the finding of neglect, asserting that his judgment as to the lack of genuineness and relevancy of Wilson's alleged witnesses was correct and justified by later events. But the failure to seek out and interview these witnesses was not the only basis for the committee's finding that respondent was guilty of neglect.

Assuming, as respondent claimed, that his telephone conversation with the Assistant United States Attorney on November 13, 1981, constituted adequate discovery, it came much too late. Respondent was re-

---

**6.** Wilson also named two other persons, friends of his co-defendant, who, he said, could testify that he had been drinking at a bar near the place that the assault occurred. Respondent concluded that even if the witnesses could be found, their testimony would not be helpful, and he therefore made no attempt to identify or interview them (Tr. 113).

tained on June 11. He learned the basic facts of the government's case from the preliminary hearing on June 19, 1980. Yet between that time and November 13, respondent did nothing to investigate the facts of the case and did nothing to advance his client's cause except to write the letter to Judge Ugast.

As the Committee pointed out, respondent undertook no investigation or discovery within the period provided for filing a motion to suppress. Since the crime took place at 3:45 a.m. in the morning in an alley, there was a distinct possibility (as respondent himself apparently recognized by his plan to "knock down" the government's case) that there could have been a misidentification. Nevertheless, respondent did not attempt to interview the police officers or the complaining witness; he did not examine the torn shirt to see whether the tear was compatible with the version offered by the witness or by his client; he did not investigate or send someone to investigate the scene of the crime to determine whether lighting at the time of the offense made identification possible.

Respondent made a determination, on his own, that no investigation was necessary because his client was guilty. The Committee thus properly found that respondent had neglected his client's case in violation of DR 6–101(A)(3).

### III. *RECOMMENDED SANCTION.*

We consider the two cases together for the purposes of determining the sanction that we recommend be imposed for respondent's actions. In the Benjamin case, the Committee recommended an informal admonition; in the Wilson case, it recommended suspension for ten days. We think neither sanction is adequate in itself and certainly not adequate when respondent's conduct is considered as a whole with respect to the two charges.

Although the facts of the two cases are distinct, respondent's conduct manifests the same underlying misconception of his obligation as an attorney. Respondent does not consider it his duty to be a representative or advocate for his client. He seems to think of himself as an arbiter who has the right to make decisions for his clients regardless of their wishes. Thus, in the Benjamin case, respondent insisted on telling the judge that he did not approve of his client's decision to plead guilty. In the Wilson case, he decided early that the client was guilty, despite the client's insistence on his innocence, and therefore felt it unnecessary to interview the client's suggested witnesses or to make any investigation.

Respondent's insistence on the validity of his own judgment, without regard to the wishes of his clients, is emphasized by the hostility that he displayed when his judgment was questioned. In the Benjamin case, the Committee noted that respondent's conduct was stubborn, petulant and abrasive, in one instance stopping just short of violence. In the Wilson case, respondent admitted becoming angry when the client chose a new attorney and therefore abusing the client with intemperate language. Several days later, on the date set for trial, respondent sought out Wilson's mother and subjected her to such abuse that she felt impelled to complain to Bar Counsel.

While in each case, the Committee expressly disclaimed basing its findings on respondent's unprofessional demeanor in these respects, we think that the arrogance respondent displayed in his dealing with his client is properly taken into account as reflecting his lack of a sense of professional responsibility. This lack caused the specific acts of misconduct that we have found have been established by the evidence.

There are no precise precedents in this jurisdiction for the type of misconduct we have found exhibited in these cases (three instances of willful refusal to pursue the client's lawful objectives in two separate cases), but we think that the totality of circumstances warrants suspension for a period of sixty days.

In the Wilson case, respondent sued his client for the $600 not paid under the origi-

nal $1,000 retainer. He obtained a default judgment for that amount, but a motion to open the default was pending at the time of the hearing. The Hearing Committee was of the view that respondent had earned no more than the $400 he had originally received and recommended that, if respondent recovered any more, he should make restitution to Wilson. At the time of argument before the Board, we were informed that the default had been opened; that respondent's claim had been litigated with Wilson being represented by Law Students in Court; and that the matter was awaiting decision. Since the issue of the fee is *sub judice,* we do not believe that it is appropriate for the Board to pass on the matter. We therefore make no recommendation with respect to restitution.

Accordingly, we recommend that respondent be suspended for a period of sixty days.

BOARD ON PROFESSIONAL
RESPONSIBILITY
By: /s/ Beatrice Rosenberg
  BEATRICE ROSENBERG
By: /s/ Mark W. Foster
  MARK W. FOSTER

Date: June 15, 1982

All members of the Board participated in this matter and join in this recommendation, except Mrs. King, who feels that a thirty-day suspension is the appropriate sanction.