**In the Matter of John J. STANTON, Petitioner.**

**No. 86–1390.**

District of Columbia Court of Appeals.

Argued May 4, 1987.
Decided Oct. 13, 1987.

John J. Stanton, pro se.

Wallace E. Shipp, Jr., Deputy Bar Counsel, Washington, D.C., Thomas H. Henderson, Jr., Bar Counsel, and Elizabeth A. Kohlman, Assistant Bar Counsel, Washington, D.C., were on the brief for the Office of Bar Counsel.

Before MACK and FERREN, Associate Judges, and NEBEKER,[*] Associate Judge, Retired.

PER CURIAM:

This is a petition for reinstatement to the Bar of the District of Columbia filed pursuant to D.C. Bar R. XI, § 21(5), by an attorney who was suspended from the practice of law for a year and a day because of several disciplinary rule violations. The hearing committee which conducted a hearing on the petition and the Board on Professional Responsibility (the Board) have recommended that reinstatement be denied. The Office of Bar Counsel, which participated in this matter before the hearing committee and the Board, joins in their recommendation to this court. We agree that petitioner has failed adequately to demonstrate his fitness to resume the practice of law, and therefore we dismiss his petition for reinstatement. *See id.,* § 21(6).

The year and a day suspension was imposed by this court for petitioner's violations of DR 6–101(A)(3) (neglecting a legal matter entrusted to him) and DR 7–101(A)(1) (intentional failure to seek a client's lawful objectives) in each of two cases in which he had been appointed under the Criminal Justice Act to represent defendants in criminal matters before the Superior Court. We adopted the Board's findings and recommended sanctions for such violations in *In re Stanton,* 470 A.2d

---

[*] Judge Nebeker was an Associate Judge of this court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1987.

272 (D.C.1983) (*Stanton I*). Our decision in *Stanton I* sets forth the factual bases for the year and a day suspension from which petitioner now seeks reinstatement to the Bar. In addition, on the same day that we ordered petitioner suspended for this period, we imposed on him a concurrent sixty-day suspension for violations of the same disciplinary rules which occurred when he represented other criminal defendants in the Superior Court. The disposition resulting in the sixty-day suspension is reported at *In re Stanton*, 470 A.2d 281 (D.C.1983) (*Stanton II*), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 821 (1984). The concurrent suspensions became effective on June 22, 1984, and petitioner sought reinstatement on June 27, 1985.

A hearing on the petition for reinstatement was conducted on September 19, 1985. Testimony was elicited from petitioner and his character witness through crossexamination by Bar Counsel. In addition, petitioner and Bar Counsel introduced documentary evidence. The hearing committee's recommendation that reinstatement be denied, and reasons therefor, were comprehensively reported on January 28, 1986. On September 23, 1986, the Board reported its recommendation that petitioner be denied reinstatement. The Board concluded that petitioner had failed to prove his compliance with D.C.Bar R. XI, § 19, as principally evidenced by his "continuing practice of law during his period of suspension." This conclusion was grounded on evidence that petitioner had held himself out as a practicing attorney while representing clients before the D.C. Rental Housing Commission. More particularly, during his year and a day suspension petitioner had provided, in his own words, "legal services for clients" before the agency, had used stationery identifying himself as an attorney-at-law, and had used his D.C.Bar number on a pleading. Alternatively, the Board concluded that petitioner had failed to establish by clear and convincing evidence his fitness to resume the practice of law under the criteria announced by this court in *In re Roundtree*, 503 A.2d 1215, 1217 (D.C.1985).

■ In his brief to this court, petitioner raises two arguments in seeking reinstatement to the Bar. He first contends that our orders in *Stanton I* and *Stanton II* suspending him from practice should be vacated because of constitutional infirmities attendant to those proceedings. On this point, he maintains, for example, that he was denied due process because of the "vagueness and overbreadth" of the charges lodged against him. Petitioner also argues strenuously—as he has throughout these reinstatement proceedings—that our decisions in *Stanton I* and *Stanton II* held him accountable, *ex post facto*, for conduct which no attorney could have foreseen would be deemed violative of this jurisdiction's disciplinary rules. However, the scope of the reinstatement proceeding now before us is only to determine whether petitioner is fit to resume the practice of law. *See* D.C.Bar R. XI, § 21(6). We agree with Bar Counsel that petitioner is precluded from challenging the constitutionality of the earlier disciplinary proceedings and dispositions of this court. *See generally Henderson v. Snider Bros., Inc.*, 439 A.2d 481, 485 (D.C.1981) (principles of *res judicata* bar relitigation of a defense which was, or might have been raised in previous action).

■ The issue which is properly before us is whether petitioner established his fitness to resume the practice of law, as required by D.C.Bar R. XI, § 21(6). The standards by which we make that determination are fully set forth in *Roundtree, supra*, 503 A.2d at 1216–17. We emphasize here that petitioner has the burden of demonstrating by clear and convincing evidence his fitness for reinstatement. *Id.* at 1216–17 & n. 6 And the five factors to be considered in each reinstatement case are (1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and

competence to practice law. *Id.* at 1217. Moreover, although we are not bound by the Board's findings or recommendations, they are entitled to great weight. *Id.*

█ We agree with the Board and the hearing committee that reinstatement should be denied. First, petitioner failed to comply with his suspension order when he held himself out as a practicing attorney appearing before the Rental Housing Commission. This default, by itself, bars reinstatement. *See* D.C.Bar R. XI, § 19(5). D.C.Bar R. XI, § 19(2), consistent with this court's rules on the unauthorized practice of law, D.C.App.R. 49(b), implicitly prohibits a disbarred or suspended attorney from practicing law before administrative agencies of the District of Columbia. *Cf.* D.C. Bar Ethical Consideration 3–9 ("[I]t is improper for a lawyer to engage in practice where he is not permitted by law or by court order to do so."); *Bowles v. Laws,* 59 App.D.C. 399, 45 F.2d 669, *cert. denied,* 283 U.S. 841, 51 S.Ct. 488, 75 L.Ed. 1452 (1930) (court affirms contempt order against disbarred attorney for attempting to practice law after disbarment).[1] Furthermore, petitioner's holding of himself out as an attorney during the period of suspension would, alone, merit denial of reinstatement because such conduct constitutes the unauthorized practice of law. *See* D.C.App.R. 49(b)(1); *In re Peterson,* 274 N.W.2d 922, 926–27 (Minn.1979) (disbarred attorney denied reinstatement because, *inter alia,* during period of disbarment he engaged in the unauthorized practice of law by holding himself out as an attorney). *Cf.* D.C.Bar Ethical Consideration 2–13 ("In order to avoid the possibility of misleading persons with whom he or she deals, a lawyer should be scrupulous in the representation of his or her professional status.").

But even accepting petitioner's contention that he did not engage in any unauthorized practice before the Commission be-cause he was acting in a lay capacity, as apparently was permitted under Commission rules, and that use of his bar number was merely a means of identification, we nevertheless hold that he has not demonstrated by clear and convincing evidence his fitness to resume the practice of law under the standards enunciated in *Roundtree, supra.* In our view, it is quite clear that petitioner refuses to acknowledge or appreciate the seriousness of his misconduct. For example, when asked at the hearing whether he had considered taking an ethics course during his suspension, he responded: "No. I have never had a problem knowing what the ethics rules require." And when questioned about his responsibility to a criminal defendant who wishes to plead guilty, petitioner made it clear that he would not act differently from the way he did before. *See Stanton I, supra,* 470 A.2d at 274; *Stanton II, supra,* 470 A.2d at 288. When asked at the hearing whether he would assume the role of an advocate for a client who desired to plead guilty, petitioner answered: "Not until after the plea is accepted. Then you start advocating for the best possible sentence. If the guilty plea is accepted, you lose the case, and the client gets convicted. Who wants to advocate for that kind of result?"

In short, petitioner has not demonstrated by clear and convincing evidence his fitness to resume the practice of law. Therefore, the petition for reinstatement is hereby dismissed.

*So ordered.*

MACK, Associate Judge, concurring:

I concur in the result reached by the majority, but write separately to indicate not only my reasons, but my reservations.

As the majority notes, it is petitioner's burden to demonstrate by clear and convincing evidence his fitness for reinstate-

---

1. Petitioner has not been cited for contempt for noncompliance with the suspension order. Nonetheless, in an appropriate case this would be one way of redressing such a violation. *See* D.C.App.R. 49(d); D.C.Bar R. XI, § 1. Thus, where the Board or the Office of Bar Counsel learns that a disbarred or suspended attorney is continuing to practice law in this jurisdiction, it appropriately might bring the violation to this court's attention by filing a contempt petition. *See generally* D.C.Bar R. XI, § 4(3)(a); *id.,* § 6(1).

ment. Given this burden (although the issue is a close one), I can agree that under the criteria announced by this court in *In re Roundtree*, 503 A.2d 1215 (D.C.1985), petitioner has failed to adequately demonstrate his fitness to resume the practice of law. However, because I believe the majority's conclusion that petitioner would act no differently from the way he did before with regard to guilty pleas is factually insupportable, and that the majority's analysis implicitly takes into account factors such as Mr. Stanton's personal philosophy about the ideal role of a defense attorney (specifically, his opinions on plea bargaining), I concur in the result only.

## I

I disagree with the first ground upon which the majority relies in denying reinstatement (failure to comply with the order of suspension due to unauthorized practice). I do not believe that petitioner's appearance before the Rental Housing Commission should operate to bar him from reinstatement. As the hearing committee observed, this court has never indicated that use of a bar number (which Mr. Stanton said he used only as a means of identification) in the course of representing persons in administrative proceedings constitutes a representation of good standing in the D.C.Bar. In its report, the hearing committee stated:

> [W]e are of the opinion that the limited practice of law during this Petitioner's suspension should not by itself disqualify him from having his petition considered ... [H]e did in fact make a diligent and apparently complete effort to give the required notice of suspension to all of his clients and to all opposing counsel. Against this background of an apparently diligent effort to comply with the Rule his violations appear *de minimus*. Second, we are not aware of any prior decisions by either the Court of Appeals or the Board (or for that matter, the Committee on Unauthorized Practice) holding that use of a D.C.Bar number by an advocate in the course of judicial or administrative proceedings constitutes a holding out or a representation that the

person involved is an active member of the Bar in good standing.

> Board on Professional Responsibility Hearing Committee Report and Recommendation, *In re John J. Stanton*, September 19, 1985, at 7.

Given that the Commission rules permit laypersons to practice before the RHC, and that Mr. Stanton was a *party* to the proceeding in question, I do not believe our decision here should turn on a point upon which we have not been altogether clear.

The majority stresses that both the hearing committee and the Board on Professional Responsibility concluded that petitioner had failed to prove his compliance with D.C.Bar R. XI, § 19, stating that the Board's findings or recommendations are "entitled to great weight." However, this court owes far less deference to the findings of the Board on Professional Responsibility in a petition for reinstatement than in disciplinary cases. "In disciplinary cases we are required by rule to accept the findings of the BPR if they are supported by substantial evidence. No such requirement appears in the rule governing reinstatements; on the contrary, the rule makes clear that the recommendation of the BPR is only a recommendation, and that the determination of fitness to resume the practice of law rests entirely with this court. D.C.Bar R. XI, § 21(5), (6)." *In re Roundtree, supra*, 503 A.2d at 1217 (footnote omitted).

## II

The second ground on which the majority bases its decision to deny reinstatement is petitioner's failure to affirmatively demonstrate by clear and convincing evidence his fitness to resume the practice of law under the standards enunciated in *Roundtree*. The majority correctly identifies the five factors to be considered in reinstatement cases: (1) the nature and circumstance of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed; (4) the attorney's present charac-

ter; and (5) the attorney's present qualifications and competence to practice law. *In re Roundtree, supra*, 503 A.2d at 1217. It is in the application of one of these individual factors to the facts of the instant case that I part company with the majority's analysis.

Based on statements made by Mr. Stanton at the September 19, 1985 reinstatement hearing before the Board on Professional Responsibility Hearing Committee, the majority concludes that "It is quite clear that petitioner refuses to acknowledge or appreciate the seriousness of his misconduct." Majority opinion at 97. In partial support of this conclusion the majority declares "petitioner made it clear that he would not act differently from the way he did before" with regard to his guilty plea practice. I find this conclusion factually insupportable.

Part of the factual basis for the year and a day suspension from which petitioner now seeks reinstatement involved an incident in which Mr. Stanton "thwarted" his client's right to plead guilty. *See In re Stanton*, 470 A.2d 281, 288 (D.C.1983) (*Stanton II*), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 821 (1984). Since Mr. Stanton indicated at the September 19, 1985 reinstatement hearing that he would not in future interfere with his client's plea, and in fact would serve as an advisor to a client wishing to plead guilty, I do not understand how the majority can conclude that Mr. Stanton has no intention to act any differently in serving as counsel for clients who wish to plead guilty. Mr. Stanton did state at the September 19, 1985 reinstatement hearing that he would not *personally* articulate a client's plea of guilty in court; however, Super.Ct.Crim.R. 11 does not require him to. Moreover, when asked at the hearing what he would do if he was certain his client wanted to plead guilty, but simply could not articulate his wish to the judge, petitioner stated: "if such a thing ever did happen I suppose I would make an exception and say something to the effect of 'the defendant tells me he wants to plead guilty, but he doesn't want to tell you that himself, he wants me to tell you.'"

The following discussion at the September 19, 1985 hearing further illuminates petitioner's view of his role at the plea hearing:

Q. What about if the Judge asks what the defendant's understanding is of the maximum sentence or mandatory minimum sentence and things like that, and you told the client what those were—

A. And he forgot?

Q. —and he forgets?

A. Then you remind him. You are standing right next to him. You can remind him.

Q. What about when the Judge starts going through the rights that he is giving up by pleading guilty, the right to go to trial, right to present witnesses, right to have counsel present and all that, and then I assume that you will have already discussed that with the client; is that correct?

A. That's correct.

Q. What about when the Judge goes through all that, and he shows confusion about it?

A. Find out what he is confused about, and make sure he understands. But I wouldn't insist to the Judge, well, the guy is momentarily confused, but he really wants to plead guilty. I wouldn't do that. I would make sure that the client understands the question, and that's all. That's all I am there for. I am just there to make sure that the plea is voluntary, not to help them make their plea. If you help a client make a guilty plea, do a guilty plea yourself, what you are doing is you are affecting the voluntariness of it whether you realize it or not. You are giving a client an impetus, you are giving him a shove towards conviction by guilty plea.

\* \* \* \* \* \*

Q. Why do you think you are there at a guilty plea if you don't think he needs a lawyer?

A. I think I have said at least twice to be there to advise him, to make sure he understands the questions.

Given this colloquy, I believe that the majority's observation that petitioner "would not act differently from the way he did before" with regard to his representation of clients wishing to plead guilty is not supported by the record. The majority's focus on petitioner's "attitude," his alleged "refus[al] to appreciate the seriousness of his misconduct," is thus unwarranted.

III

At the reinstatement hearing, much emphasis was placed on petitioner's personal opinions on the practice of pleading guilty. The implication present throughout the hearing (and certainly not laid to rest by the majority opinion today) was that petitioner's "attitude" toward plea bargaining is a proper basis for denial of reinstatement. I take this opportunity to suggest to all of us who are charged with the responsibility of ensuring the effectiveness of our disciplinary system that we must be extremely careful to distinguish between a lawyer's right to disagree from a philosophical standpoint and his or her pledge to comply with an accepted code of conduct, regardless of the lawyer's personal feelings about the wisdom of policies or principles underlying that code. Turning to Mr. Stanton, as long as he pledges to comply with the Rules on Professional Responsibility in the course of representing his clients, it is irrelevant that he personally thinks that advising clients to plead guilty is antithetical to the fair administration of justice.[1]

In a petition for reinstatement we are put in the difficult position of forecasting a person's future fitness to practice law, a type of prediction which is necessarily subjective in nature.[2] But there is a fine line between (properly) requiring "moral fitness," and requiring petitioner to actually agree from a philosophical standpoint on the underlying value of a rule or the rightness or wrongness of a given viewpoint. That line seems to have become blurred at petitioner's reinstatement hearing. Consider the following colloquy from the hearing of September 19:

1. I note that Mr. Stanton is not alone in his belief that defense attorneys should almost never advise their clients to plead guilty. The Washington Post reports that Alton Maddox, civil rights attorney, also "does not believe in plea bargaining and always urges his client to go to trial," and reports the following colloquy:

But in an already overburdened court system, isn't plea bargaining a necessary evil, a lubricant for the criminal justice system? Maddox shakes his head no. "In order to get things, somebody has to take a bold stand, like a Rosa Parks," he says. "My job, as a criminal defense attorney, is to get my clients acquitted. It is not up to me to decide guilt or innocence, that's up to the jury. I just ask my clients to tell me what happened."

Nelson, *Up Against the System,* WASHINGTON POST MAGAZINE, May 16, 1987, at 14, 42. Given the dominance of guilty pleas in our criminal justice system—guilty pleas account for 87.1% of all adult felony convictions and 91.4% of all adult misdemeanor convictions in the D.C.Superior Court—as well as the fact that, by pleading guilty an accused surrenders a whole panopoly of constitutional rights, the burgeoning institution of plea bargaining has been subject to increasing scrutiny. THE DIST. OF COLUMBIA GOV'T, INDICES—A STATISTICAL INDEX TO DISTRICT OF COLUMBIA SERVICES 224 (1986). *See also* McDonald, *Judicial Supervision of the Guilty Plea Process: A Study of Six Jurisdictions,* JUDICATURE, Vol. 70, No. 4 (Dec.–Jan. 1987) at 203 ("[t]hree serious institutional weaknesses of plea bargaining compared to trial as a method of determining guilt are: plea bargaining relies on inducements; in plea bargaining the available evidence may not be assessed against any standard of proof, much less the hallowed legal standard of proof beyond a reasonable doubt; and in plea bargaining the available evidence may not be assessed by an independent, impartial, third party. For any or all of these reasons, plea bargaining is regarded as posing a threat of convicting the innocent"). *Id.* at 209. In interviews with non-random samples of defendants who had pleaded guilty, it was found that most defendants (77%) felt they had to accept the plea agreement. Half the defendants reported that their attorneys advised them how to answer the questions at plea taking. In several cases, the "advice" was to say "yes" to everything. *Id.* at 211.

2. As the court in *Roundtree* explains:

To make that determination [of fitness to practice under D.C.Bar R. XI, § 21(6) ] we must conclude that [a petitioner] has the "moral qualifications, competency, and learning in law required for readmission," so that [a petitioner's] reinstatement would "not be detrimental to the integrity and standing of the Bar, or to the administration of justice, or subversive to the public interest. D.C.Bar R. XI, § 21(5)."

*Id.* at 1216.

Q. Let me ask you this, all the findings that the Hearing Committees and the Boards made on all the different cases that are before us today, not in terms of whether or not you will conform to what they state in the future, but just in terms of whether or not you agree with the findings; do you agree with any of those findings of violations of the Disciplinary Rules?

A. I don't agree with any of them. I don't think I am required to. I don't think I am obliged to. My role here is to demonstrate ability, competence, and moral integrity, and I believe that pledging to expand and improve case preparation operations where indicated I think is perfectly appropriate. I think that anyone should be willing to make such a pledge anytime.

If it is true that petitioner "is free to criticize the state of the law," as the Supreme Court ruled in *In re Sawyer*, 360 U.S. 622, 631, 79 S.Ct. 1376, 1380, 3 L.Ed.2d 1473 (1959) then the fact that petitioner personally disagrees with other members of the profession on various legal issues (specifically, the advisability of plea bargaining) should have no bearing on his right to practice his profession, and has no place in a decision to deny reinstatement.

## IV

Much of Mr. Stanton's difficulty derives from his understanding or misunderstanding of the division of decisionmaking between attorney and client: a subject area in which neither academics nor practitioners always agree. *See, e.g.,* Freedman, *Legal Ethics and the Suffering Client,* 36 CATH. U.L.REV. 331 (1986) (critiquing Professor Thomas Shaffer's views on the degree of autonomy that a client should have in making decisions about the case). Theoretically, of course, it is the client who sets the objectives of the representation and makes the ultimate decisions. Yet, while there are some areas where there is no question as to whom the decision belongs (*e.g.,* "In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify"), Model Rules of Professional Conduct Rule 1.2, there are other areas in which the assignment of decisionmaking is not so clearcut ("in both criminal and civil matters, the lawyer is the master of procedural and tactical aspects of litigation. This inherent authority is derived from the lawyer's expertise in legal strategy and procedure") (citations omitted) ABA/BNA LAWYER'S MANUAL ON PROFESSIONAL CONDUCT, § 31:304 (1984). Determining what does and does not fall within the purview of an attorney's inherent authority to make tactical decisions can be extremely difficult, however.[3]

---

**3.** There is a delicate balance between enforcing the mandate of the ethical canons and disciplinary rules that the wishes of a client come first and at the same time allowing an attorney latitude to make tactical decisions which he or she believes are in the best interest of his client. The court in *In re Stanton II, supra,* recognized as much when it criticized the attempt to judge with hindsight Mr. Stanton's tactical decisions:

A lawyer is duty-bound to exercise his best professional judgment on behalf of his client. Only where total inattention or incompetence is made out on the part of the lawyer in reaching the decision should we ever be in the business of assessing the correctness of the lawyer's advice to his client. Otherwise, we put ourselves in the position of a sort of court of appeals from lawyers' judgments. Any attempt on our part to do so would be the worst sort of second-guessing or Monday morning quarterbacking.

*Id.* at 287. Numerous cases discuss the necessity for an attorney to exercise discretion in following the client's objectives. *See Polk County v. Dodson,* 454 U.S. 312, 102 S. Ct. 445, 452, 70 L.Ed.2d 509 (1981) ("although a defense attorney has a duty to advance all colorable claims and defenses, the canons of professional ethics impose limits on permissible advocacy. It is the obligation of any lawyer—whether privately retained or publicly appointed—not to clog the courts with frivolous motions or appeals"); and *Minns v. Paul,* 542 F.2d 899, 901 (4th Cir.1976) (discussing "the need to encourage counsel, in the full exercise of professionalism, *i.e.,* the unfettered discretion, in the light of their training and experience, to decline to press the frivolous, to assign priorities between indigent litigants, and to make strategic decisions with regard to a single litigant as to how best his interests may be advanced"). *See also* ABA Standards for Criminal Justice, Commentary § 4–39 (2d ed. 1980) ("no lawyer, whether assigned by the court, part of a legal aid or defender staff, or privately retained or paid, has any duty to take

In any case, it appears to me that Mr. Stanton has an adequate understanding of his client's right to make decisions about his own defense. When asked in what other areas besides the bond review motion and guilty plea practice he believed a client's view must apply without question he answered: "A client's view must apply, as I understand it, as to whether a jury trial would be waived, [and] as to whether a client would testify in their own defense in a criminal case," stating, "I think generally it is fair to say that you are obliged to consult with the client, and where the client's views are lawful, reasonable, and looks as if they will be effective, I think you are certainly under a moral obligation to utilize the client's views wholly or in part."

## V

While I can agree that petitioner has failed to carry his affirmative burden of proving by clear and convincing evidence his fitness to resume the practice of law, the fact that petitioner holds philosophical beliefs concerning the ideal role of the defense attorney which might happen to differ from those of individual members of the profession has no place in our decision.

Mr. Stanton has been a criminal defense attorney for ten years. He reports that his "success ratio" (*i.e.*, number of acquittals as compared to number of trials) is high. Recognizing the difficulty of the defense attorney's job considering relatively low pay under the Criminal Justice Act and the nature of the work, I believe that we should resist any inclination to chastise Mr.

Stanton for what amounts to having strong convictions.[4]

---

any steps or present dilatory or frivolous motions or any actions that are unfounded according to the lawyer's informed professional judgment").

4. Mr. Stanton filed his petition for reinstatement immediately after the expiration of his year and a day suspension (June 27, 1985). The hearing on his application was held September 19, 1985; the Board on Professional Responsibility did not issue its Report and Recommendation until January 28, 1986. At present, over two years has elapsed from the time petitioner was first eligible for reinstatement. Mr. Stanton has been effectively suspended from practice over three years. Under Rule XI, § 21(8)

this court may fashion a different period for renewing the petition for reinstatement (Rule XI, § 21(8) states: "In the event a petition for reinstatement is denied, no further petition for reinstatement may be made until the expiration of at least one year following the denial unless another period for renewing the petition for reinstatement was specified in the order of suspension or in any order denying a prior petition for reinstatement.")

I would recommend that Mr. Stanton be allowed to file another petition for reinstatement before the expiration of the standard one-year period.